## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-00884-SCT

*TITAN INDEMNITY COMPANY*

*v.*

*TERRY ESTES, PAULA ESTES AND BRETT ESTES, INDIVIDUALLY, AND AS WRONGFUL DEATH BENEFICIARIES OF HAILEY ELIZABETH ESTES, DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 6/7/2001 |
| TRIAL JUDGE: | HON. LILLIE BLACKMON SANDERS |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | BENJAMIN E. GRIFFITH |
| ATTORNEYS FOR APPELLEES: | R. KENT HUDSON |
| | BRUCE M. KUEHNLE |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | REVERSED AND RENDERED-09/05/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/26/2002 |

**BEFORE SMITH, P.J., AND CARLSON AND GRAVES, JJ.**

**GRAVES, JUSTICE, FOR THE COURT:**

¶1. This appeal concerns insurance coverage applicable to a vehicle-fire engine collision which occurred on March 7, 1996, and resulted in the deaths of Hailey Elizabeth Estes and her passenger, Mindy Carlson.

### FACTS

¶2. At approximately 11:00 p.m. on March 7, 1996, all personnel at Station 2 of the City of Natchez fire department were dispatched to a house fire in the northern part of the city. Captain Bobby Stutzman was driving the fire engine en route to the house fire. Firefighter Henry Floyd was riding shotgun. As the fire engine approached the intersection of Sargent S. Prentiss Drive and Melrose-Montebello Parkway, it was traveling between 55-60 miles per hour. According to all eyewitnesses, including firefighter Henry Floyd, as the fire engine approached the intersection, the traffic control signal facing Captain Stutzman was red. Hailey Estes and Mindy Carlson were crossing the intersection in a 1993 Mazda on a green light. After having been warned twice of the approach of the Estes vehicle by firefighter Henry Floyd, Captain Stutzman finally applied the brakes of the fire engine 30 feet from the point of impact. Hailey Estes and Mindy Carlson were killed as a result of the accident.

¶3. A blood test performed on Captain Stutzman revealed the presence of the drugs Ultram, Tranxene, Xanax and Chlorzoxazone. Captain Stutzman was later indicted by the Adams County Grand Jury for felony DUI/negligent homicide, and his employment with the City of Natchez Fire Department was terminated. Captain Stutzman appealed his termination to the Natchez Civil Service Commission and urged as a basis for the appeal that Chief Gary Winborne and all others in the fire department knew that he had a long history of taking pain medication and that on the day of the accident, he had requested that he be relieved of the responsibility of driving the fire engine.

¶4. The record reveals that on the morning of March 7, 1996, Captain Stutzman asked his immediate supervisor that a relief driver be called in so that he would not have to drive and operate the fire engine. Chief Winborne was made aware of this request, but refused it stating, "drive or take you're a-- home. I am not authorizing overtime."

¶5. The City implemented a drug testing policy in October, 1992. This policy specifically provided for the mandatory termination of any employee whose initial positive test result was confirmed by a mandatory second test on the same sample. Captain Stutzman tested positive for the use of opiates on at least two occasions prior to the accident on March 7, 1996. These tests were performed at a time when Winborne was either Interim Chief or Chief of the Natchez Fire Department. Captain Stutzman was able to obtain statements from his physicians explaining that the medications prescribed by them would result in a positive drug screen. In spite of Captain Stutzman's reputation as a drug user and concerns that Captain Stutzman represented a danger to both the public and to other firemen, no limitations were placed on Captain Stutzman's duties.

¶6. At the time of the accident, the City had three insurance policies; a business auto policy that provided a maximum limit of liability in the amount of $500,000, a commercial general liability ("CGL") policy that provided a maximum limit of liability in the amount of $500,000, and a public officials policy that provided a maximum limit of liability in the amount of $500,000.

¶7. The family of Mindy Carlson was paid $250,000 by the City of Natchez' insurer, Titan Indemnity Company ("Titan"), under the business auto policy.

¶8. As a result of Hailey's death, the Estes family filed a wrongful death suit against the City of Natchez, Captain Stutzman and Chief Winborne. Declaratory judgment actions were brought by the City against its insurer, Titan, and by Titan against the City seeking an adjudication with regard to coverage under the three insurance policies. The Estes family claimed that they were entitled to coverage and indemnification under all three policies issued by Titan.

¶9. Titan acknowledged its duty to defend and indemnify the City and its employees under the auto policy, subject to its terms, provisions and limits of liability, but asserted that no coverage or potential indemnification was available under the other two policies.

¶10. On June 7, 2001, the trial court entered its order denying Titan's motion for summary judgment and granting the Estes family's cross-motion for summary judgment. Thus, a Final Consent Judgment was entered, whereby Titan essentially admitted liability and that $1,250,000 was the highest award possible in the event all three policies applied. The Final Consent Judgment provided that if this Court determined that the trial court erred in finding that all three policies applied, then the judgment would be satisfied by virtue of Titan's payment of the remaining $250,000 available under the auto policy. Hence, the issue presented for

resolution by this Court is whether the trial court erred in finding all three insurance policies applied.

## STANDARD OF REVIEW

¶11. This Court's standard of review for summary judgment is well-settled and is the same standard employed by the trial court under Rule 56(c). This Court conducts a de novo review of orders granting or denying summary judgment and considers all evidentiary matters before it. *Aetna Cas. & Sur. Co. v. Berry*, 669 So. 2d 56, 70 (Miss. 1996). Furthermore, motions for summary judgment are to be viewed with a skeptical eye, and if a trial court should err, it is better to err on the side of denying the motion. *Id.*

## DISCUSSION

### Business Auto Policy

¶12. Under the terms of the business auto policy, the maximum amount of insurance available was $500,000.00. Pursuant to that policy, Titan acknowledged coverage and provided a complete defense for the benefit of the City, Captain Stutzman and Chief Winborne, in accordance with the terms, provisions and limits of liability. However, Titan asserts that the anti-cumulation clause contained in the business auto policy prevents the Estes family from recovering under the CGL policy or the public officials policy. Paragraph IV.B.8 of the business auto policy states:

> If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same "accident," the aggregate maximum limit of insurance under all the Coverage Forms or policies shall not exceed the highest applicable limit of insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Form.

¶13. The Estes family responds that the anti-cumulation clause is inapplicable because both the CGL policy and the public officials policy serve as excess policies. In response, Titan does not address the fact that both the CGL policy and public officials policy contain "excess" language. Titan responds, however, that the CGL policy contains an auto exclusion that precludes recovery in this instance and that the public officials policy contains a bodily injury exclusion that precludes recovery in this instance. The language regarding coverage and exclusions provided for under the CGL policy and the public officials policy are discussed separately below.

¶14. The City's Titan CGL policy provides in pertinent part:

### CGL Policy

### SECTION I - COVERAGES

### A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

* * *

2. Exclusions

This insurance does not apply to:

* * *

g. Bodily injury or property damage arising out of the ownership, maintenance, use or entrustment to others of any aircraft, auto or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and loading or unloading.

This exclusion does not apply to

* * *

(5) Bodily injury or property damage arising out of the operation of any of the equipment listed in paragraph f.(2) or f.(3) of the definition of mobile equipment. (Section VI.9).

SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

* * *

4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

b. Excess Insurance

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

* * *

(4) If the loss arises out of the maintenance or use of aircraft, autos or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I).

* * *

SECTION VI - DEFINITIONS

* * *

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But auto does not include mobile equipment.

* * *

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

* * *

9. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

* * *

f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not mobile equipment but will be considered autos.

* * *

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

¶15. Titan argues that the CGL policy's auto exclusion prevents recovery in this instance. Titan declares that the fire engine constitutes an "auto" and because the underlying wrongful death action arose out of the use or entrustment of the fire engine, the auto exclusion applies. Thus, Titan asserts that recovery is precluded.

¶16. On the other hand, the Estes family maintains that they have asserted other proximate causes of Hailey's death which are not excluded under the auto exclusion. For example, the Estes family asserts claims for failure to adequately train Captain Stutzman and negligent breach of duty to prevent Captain Stutzman from operating the fire engine when the City and/or Chief Winborne knew or should have known Captain Stutzman was under the influence of narcotic drugs. The Estes family also assert that the City breached its mandatory drug testing policy by allowing Captain Stutzman to remain on the job after he repeatedly failed drug tests and by ordering Captain Stutzman to drive the fire engine when the City and/or Chief Winborne knew or should have known that Captain Stutzman was impaired and that such action would endanger the lives and safety of other motorists.

¶17. Ambiguous terms in an insurance contract are to be construed most strongly against the preparer, the insurance company. *United States Fid. & Guar. Co. v. Omnibank*, 812 So.2d 196, 198 (Miss. 2002) (citing *Nationwide Mut. Ins. Co. v. Garriga*, 636 So.2d 658, 662 (Miss. 1994)). Although ambiguities in an insurance policy are construed against the insurer, a court must refrain from altering or changing a policy where terms are unambiguous, despite resulting hardship on the insured. *State Farm Mut. Auto Ins. Co. v. Scizts*, 394 So.2d 1371, 1373 (Miss. 1981). A clear and unambiguous contract will be enforced as written. *Delta Pride Catfish, Inc. v. Home Ins. Co.*, 697 So.2d 400, 403 (Miss. 1997).

¶18. Although the Estes family argues that the other proximate causes asserted are not so intertwined with the use or maintenance of the fire engine to fall within the auto exclusion, we disagree. Coverage under the CGL policy should not vary depending upon the theories of liability asserted. This Court will not recognize a strained interpretation of a policy. *Allstate Ins. Co. v. Moulton,* 464 So.2d 507, 510 (Miss. 1985); *Warren v. United States Fid. & Guar. Co.*, 797 So.2d 1043, 1045 (Miss. Ct. App. 2001) (quoting

*Love v. McDonough*, 758 F. Supp. 397, 402 (S.D. Miss.), *aff'd mem.*, 947 F.2d 1486 (5th Cir. 1991)).

¶19. The Estes family would not have been damaged but for the collision between the fire engine and Hailey's vehicle. Therefore, given the clear and unambiguous language of the auto exclusion, the Court finds that the auto exclusion forecloses coverage under the CGL policy. Accordingly, the trial court erred in finding that the CGL policy applied.

¶20. The City's Titan public officials policy provides in pertinent part:

<u>Public Officials Policy</u>

PART I - WORDS AND PHRASES WITH SPECIAL MEANING

The following words and phrases have special meaning throughout the policy.

A. "Bodily Injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these at any time.

\* \* \*

C. "Error or Omission" means any actual or alleged error or misstatement or act of omission or neglect or breach of duty including misfeasance and nonfeasance by the insured in the discharge of their duties with the public entity.

\* \* \*

PART III - WHAT THIS AGREEMENT COVERS

A. WE WILL PAY

1. We will pay all sums the insured legally must pay as damages because of an error or omission. . . .

\* \* \*

C. WE WILL NOT COVER - EXCLUSIONS

This insurance does not apply to:

1. Bodily injury or property damage.

\* \* \*

PART IV - CONDITIONS

\* \* \*

B. OTHER INSURANCE

The insurance provided by this policy is excess over any other collectible insurance.

\* \* \*

¶21. Titan argues that the bodily injury exclusion prevents recovery by the Estes family. The Estes family insists that "there are several errors or omissions on the part of the City and its employees that proximately caused and/or contributed to the death of Hailey Estes." In particular, the City and/or Chief Winborne failed to enforce the termination policy after Captain Stutzman tested positive for drug use. The Estes family claims their loss was occasioned by the "multiple and reckless acts of negligence and breaches of duty, policy and mandate on the part of the City and its fire department." While the Estes family concedes that the bodily injury exclusion prevents recovery for pain and suffering, they assert, as wrongful death beneficiaries, they are entitled to recover other categories of damages not classified as bodily injury damages. These include the loss of the companionship and society of Hailey, the present net cash value of Hailey's life expectancy, and punitive damages. Although these damages may "arise out of" bodily injuries, the Estes family specifically assert that the public officials policy does not include the language "arising out of." Therefore, they contend, if Titan intended to exclude damages "arising out of" bodily injury, it should have specifically stated that.

¶22. Again, the Estes family argues for a "strained interpretation" of the policy in order to create otherwise nonexistent coverage. It is a tortured construction of the bodily injury exclusion to interpret it in the manner advocated by the Estes family, since the exclusion clearly and unambiguously states that the insurance does not apply to bodily injury and bodily injury includes death. "Asserting a different theory of liability to perform an end-run around the exclusion strains the clear and unambiguous language of the provision out of all bounds . . . ." *Warren*, 797 So.2d at 1045 (quoting *Love*, 758 F. Supp. at 402). Accordingly, coverage under the public officials policy is barred by the bodily injury exclusion contained in that policy, and the trial court erred in finding this policy applicable in this instance.

## CONCLUSION

¶23. As a matter of law, the trial court erred in finding that the CGL and public officials policies applied in this instance and in granting summary judgment against Titan. The auto exclusion contained in the CGL policy bars coverage under that policy. Additionally, inasmuch as application of the auto exclusion precludes coverage under the CGL policy, the CGL policy is not considered excess insurance. Likewise, application of the bodily injury exclusion bars coverage under the public officials policy. If coverage was available under both policies, then each would serves as excess policies, but because the accident herein is categorically excluded under both policies, neither serve as excess insurance. Thus, the anti-cumulation clause of the business auto policy applies, and no recovery is allowed under the CGL policy or the public officials policy.

¶24. Furthermore, when insurance policy language is clear and unambiguous, this Court will not adopt a strained interpretation in order to create nonexistent coverage that the insurer otherwise has not assumed. Therein lies the reversible error contained in the trial court's summary judgment ruling. Thus, where, as here, the terms of an insurance policy are clear, plain and explicit, the Court should not give a forced construction of the policy. Therefore, summary judgment here was not grounded upon the absence of a genuine issue of material fact nor was it anchored to any entitlement by the Estes family. The judgment of the trial court is reversed and rendered.

¶25. **REVERSED AND RENDERED**.

**SMITH, P.J., WALLER, COBB, DIAZ, EASLEY, AND CARLSON, JJ., CONCUR. PITTMAN, C.J., AND McRAE, P.J., NOT PARTICIPATING.**